IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 17, 2021 Session

## STATE OF TENNESSEE v. LAFARIS BROWN

**Appeal from the Criminal Court for Knox County**
**Nos. 115023, 114910       Bobby R. McGee, Judge**

_____

## No. E2019-02222-CCA-R3-CD
_____

Defendant, Lafaris Brown, was charged in two separate indictments with one count each of unlawful possession of a firearm and criminal gang offense enhancement. Case No. 114910, offense date January 6, 2019, was tried by jury on September 16, 2019, and Case No. 115023, offense date October 24, 2018, was tried in a bench trial on October 17, 2019. In both cases, which are consolidated on appeal, Defendant was convicted of one count of unlawful possession of a firearm. He was acquitted of the criminal gang offense enhancement count in Case No. 114910, and the trial court dismissed the criminal gang offense enhancement count in Case No. 115023. On appeal, Defendant argues (1) in Case No. 115023, that the trial court erred in denying his Motion to Suppress; (2) in Case No. 114910, (a) that the trial court erred by denying a jury instruction on a necessity defense, and (b) improper prosecutorial argument; and (3) in both cases, that the trial court erred by imposing consecutive sentences. Following a thorough review, we affirm the judgment of the trial court in Case No. 11490; however, we determine that, in Case No. 115023, law enforcement lacked reasonable suspicion to stop Defendant and that the trial court erred in denying the motion to suppress. Thus, we reverse the judgment of conviction in Case No. 115023.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court in Case No. 11490 Affirmed, and Judgment of the Criminal Court in Case No. 115023 Reversed, Vacated, and Dismissed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Eric Lutton, District Public Defender, and Jonathan Harwell, Assistant District Public Defender, Knoxville, Tennessee, (on appeal), and Mark E. Stephens, District Public

Defender, and David Skidmore, Assistant District Public Defenders, Knoxville, Tennessee, (at trial), for the appellant, Lafaris Brown.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural History**

*A. Procedural Summary*

The following chart details a summary of the dates and actions in each of the two cases on appellate review:

| Date | Case No. | Action |
|---|---|---|
| October 24, 2018 | 115023 | Offense date |
| November 20, 2018 | 115023 | The general sessions court released Defendant on pretrial supervision. |
| January 6, 2019 | 114910 | Offense date |
| February 19, 2019 | 114910 | Defendant was indicted on one count of unlawful possession of a firearm and one count of criminal gang offense enhancement. |
| February 27, 2019 | 115023 | Defendant was indicted on one count of unlawful possession of a firearm and one count of criminal gang offense enhancement. |
| April 18, 2019 | 115023 | Defendant filed a pretrial Motion to Suppress evidence of the firearm he possessed on October 24, 2018. |
| April 18, 2019 | 114910 | Defendant filed a Motion for Bond reduction. |
| April 19, 2019 | 115023 | The Knox County Sherriff's Office filed a noncompliance report due to pending charges in Case No. 114910 and requested that Defendant's pretrial supervision be revoked. |
| April 22, 2019 | 115023 | The State filed a Motion to Revoke Pre[t]rial Release |
| April 25, 2019 | 115023 | Following a hearing, the trial court revoked Defendant's pretrial supervision, set bond in the amount of $25,000, and denied Defendant's Motion to Suppress. |

| April 25, 2019 | 114910 | Following a hearing, the trial court reduced Defendant's bond from $50,000 to $25,000. |
|---|---|---|
| May 1, 2019 | 115023 | Defendant filed a supplemental Motion to Suppress, arguing that the seizure of Defendant's firearm on October 24, 2018, violated his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). |
| August 14, 2019 | 114910; 115023 | Defendant filed a Notice of Defense, stating that he would rely on the defense of necessity in both cases. |
| August 30, 2019 | 114910 | Defendant filed a Motion in Limine requesting that the trial court "not [] announce" to the jury that Defendant was arrested for vandalism and stipulated that there was an "active warrant for [Defendant] that gave the police an opportunity to arrest him" on January 6, 2019. Defendant also filed a Motion to Dismiss Gang Enhancement Allegations. |
| September 16, 2019 | 114910 | The trial court granted Defendant's Motion in Limine and denied Defendant's Motion to Dismiss Gang Enhancement Allegations. |
| September 16, 2019 | 114910 | In a bifurcated trial, the jury heard evidence on count one and convicted Defendant of unlawful possession of a firearm. |
| September 17, 2019 | 114910 | In a bifurcated trial, the jury heard evidence on count two and acquitted Defendant of the criminal gang offense enhancement. |
| October 2, 2019 | 115023 | The trial court filed a written order denying Defendant's Supplemental Motion to Suppress. |
| October 7, 2019 | 114910 | The State filed a Notice of Enhancement Factors for sentencing, listing factors (1) and (8). |
| October 10, 2019 | 115023 | Defendant waived his right to a jury trial. |
| October 17, 2019 | 115023 | Following a bench trial, the trial court found Defendant guilty of one count of unlawful possession of a firearm and dismissed the criminal gang offense enhancement in count two. |

| October 18, 2019 | 114910; 115023 | The trial court sentenced Defendant to thirteen years in the Tennessee Department of Correction ("TDOC") in each case and ran the sentences consecutively. |
|---|---|---|
| November 12, 2019 | 114910; 115023 | Defendant filed a timely Motion for New Trial. |
| December 9, 2019 | 114910; 115023 | The trial court denied Defendant's Motion for New Trial. |

*B. Testimony*

1. April 25, 2019: Pretrial Hearing on Motions

Carla Kidwell testified that she worked for the Knox County Sheriff's Department pretrial supervision office. She testified that Defendant was placed on "pretrial release" on November 20, 2018, in Case No. 115023.[1] Ms. Kidwell stated that she filed a request to revoke Defendant's pretrial supervision because Defendant was subsequently arrested for unlawful possession of a firearm in Case No. 114910, which violated Defendant's pretrial conditions in Case No. 115023.

Knoxville Police Department ("KPD") Lieutenant Kenneth Brian Bush testified that he was a patrol supervisor and that he had contact with Graham Apartment property owners on his patrol. He said that his patrol performed a "security detail" for several apartments on Magnolia Avenue, including Graham Apartments. Lieutenant Bush testified that the property owner reported "a lot of loitering in the back parking lot," "a lot of drug transactions," and "several shootings[.]" When handed a photograph of the back parking lot at Graham Apartments, Lieutenant Bush explained that the lot was "fenced off" with "No Trespassing" and "Tenants Only" signs. Lieutenant Bush said that, based upon his understanding from the property owner, if someone was present in the lot who was not a resident and was not in the company of a resident, that person did not have the owner's permission to be on the property. Lieutenant Bush stated that he knew who the six property residents were, so when he saw Defendant on the property, he knew that Defendant was not a resident.

On October 24, 2018, at 9:48 p.m., Lieutenant Bush observed Defendant "standing in the back parking lot. He was not moving. He was not walking towards an apartment." He stated, "[Defendant] was just standing there loitering in the back parking lot, which is exactly the activity that we have noticed to be suspicious." Lieutenant Bush continued:

---

[1] Case No. 115023 has the earlier offense date of October 24, 2018. Defendant was indicted in Case No. 115023 *after* he was indicted in Case No. 114910, with the later offense date of January 6, 2019.

As I turned westbound down the alleyway and turned into the parking lot, [D]efendant began walking away quickly towards the back of the apartments. Several other officers -- Officer [Chris] Brooks and Officer Claybough[2] and Officer [Gordon] Johnson were walking through the apartment complex from the front and they encountered [Defendant] on a handicap ramp access. . . .

The officers briefly spoke to him. It was a consensual encounter to start with. I believe they asked for his identification, at which time, he -- he gave them his identification. And they asked if he had any weapons. He lifted his shirt up. I don't believe the officers ever even put their hands on him. He lifted his shirt up and displayed a firearm in his waistband, at which point he was detained.

Lieutenant Bush explained that the property where Defendant was standing was "private property, fenced in, with visible signage."

On cross-examination, Lieutenant Bush stated, "We work for [the property owners] for private security, as a[n] overtime position." He said that, initially, his was the only squad car in the back parking lot. Lieutenant Bush recalled that, when Defendant began walking up the ramp, three officers approached Defendant and stood on the ramp in front of him. He said that the ramp had a handrail on it but that Defendant could have exited by Lieutenant Bush's car "if he'd wanted to." Lieutenant Bush did not know whether Defendant could have walked forward once the three officers confronted him. He did not hear Defendant's entire conversation with the other three officers because Lieutenant Bush was "10 feet, 15 feet" away from the ramp.

He agreed that residents often had guests in their apartments. Lieutenant Bush agreed that, other than loitering, he did not see Defendant engage in any criminal activity before he and his officers confronted Defendant. He explained that he believed Defendant was "trespassing." Lieutenant Bush said that, typically, he and his officers would approach people who were not residents and ask if they had "legitimate business" at the property. If a person was found not to be on the property with legitimate business, he or she were placed on a "trespass list," and then the officers would ask the person to leave. Lieutenant Bush stated that Defendant was not on the "trespass list."

Trial counsel requested to call Officer Brooks to testify as to his interaction with Defendant because Officer Brooks "seized" Defendant and took his identification card. The State agreed that Defendant was "seized" but stated that the officers had probable cause to seize Defendant because he was loitering. The trial court denied the request to

---

[2] Officer Claybough's first name does not appear in the record. No offense is intended.

call Officer Brooks, stating, "There's no [c]onstitutional [r]ight to be free of interference on private property[.]" It continued,

> [T]he evidence is that when [Lieutenant] Bush saw [D]efendant on the property doing nothing but just standing there, which he calls loitering, he had personal information. He knew who the tenants were. And he knew that [Defendant] was not one of them. So he had at least reasonable suspicion that [D]efendant was then and there committing the act of criminal trespass.

Defendant testified that he was present at Graham Apartments on October 24, 2018, to visit a friend whose girlfriend was a resident there. He explained that his friend called him to come visit, so he walked to the apartment complex from his home. He said that the path to the apartment from his home was through the back parking lot. Defendant saw Lieutenant Bush pull in, and Defendant walked up the access ramp. He said that, when he was "halfway up the ramp," three officers and Lieutenant Bush "came out." Defendant recalled that Lieutenant Bush asked him if he was a resident. Defendant told Lieutenant Bush that he was not a resident but said that he was visiting his friend and his friend's girlfriend. Defendant stated that he asked Lieutenant Bush if he could "go," but Lieutenant Bush asked for his identification. Defendant explained,

> At the same time, they running my name and stuff, he asked me did I have anything on me that will poke or stick them. At that point in time, I mean, if an officer asks you if you -- if you have anything on you that will poke or stick [him], you getting arrested. I told him I had a firearm on me.
>
> . . . .
>
> [B]efore they even found out that I had the gun, I couldn't leave. He already had my ID. He asked -- I asked him twice could I leave. He said, no. He asked for my ID. I gave him my ID. If there's no way I can leave -- if you have me -- if I have . . . my ID and I walk off, that's resisting arrest to them.

Defendant said that Lieutenant Bush asked Defendant if he was a felon, and Defendant said he was.

On cross-examination, Defendant stated that his residence was "right up the street" from Graham Apartments. He agreed that he had the "right to control who comes in and out" of his residence. Defendant stated that Lieutenant Bush was driving up while Defendant was "coming from off the street." He said that he was "never loitering" and "never stood there at one point in time."

- 6 -

The trial court denied Defendant's Motion to Suppress, stating that the officers had reasonable suspicion that Defendant "was engaging in the criminal activity of criminal trespass." Thus, the trial court found that the officers had the right to "inquire further." The trial court stated that, if Defendant had been invited by one of the residents, he would have been a social guest and not a criminal trespasser.

The trial court revoked Defendant's pretrial supervision and set the bond in each case at $25,000.

### 2. September 16-17, 2019 Bifurcated Jury Trial Testimony in Case No. 114910

The two counts in Case No. 114910 were tried separately; Defendant was first tried on unlawful possession of a firearm and later on the criminal gang offense enhancement. In the first part of the bifurcated trial, KPD Officer Gordon Johnson testified that, in January 2019, he was familiar with Defendant by name and appearance and knew that Defendant had a prior felony conviction[3] and an outstanding warrant for his arrest. Officer Johnson said that, on January 6, 2019, he was on patrol when he saw Defendant walking eastbound on Magnolia Avenue. Officer Johnson pulled over, got out of his vehicle, and approached Defendant. Officer Johnson asked Defendant "if he had anything on him[,]" and Defendant volunteered that there was a .9 millimeter firearm in his waistband. Officer Johnson stated that he confiscated the firearm, unloaded seven bullets from the gun, and took Defendant into custody. Officer Johnson turned the firearm over to the KPD confiscations unit.

On cross-examination, Officer Johnson said that, when he approached Defendant, Defendant did not run or resist in any way and that Defendant did not threaten him.

Following a *Momon* colloquy, Defendant elected to testify. He said that he grew up in Memphis in a "[m]ajority [] black" area of town with "a lot of gang members and drug dealers[.]" Defendant recalled that, when he was twelve years old, he joined a gang called "Nine Deuce East Side Bishop Bloods" ("Bloods") and that ninety-five percent of the males in his neighborhood were in a gang. Defendant stated that he learned "how to steal cars and boost clothes" while in the gang.

Defendant recalled that a Bloods' member with "rank" over him told him to rob someone and gave Defendant a gun to do it. Defendant explained that he pled guilty to aggravated robbery in 2010 because of this offense and that, due to being incarcerated, he

---

[3] The State read into the record a certified copy of Defendant's prior felony conviction for aggravated robbery.

had an "epiphany" about what he wanted his life to be like. Defendant testified that he tried to leave the Bloods and was "beat up" twice while in prison for trying to leave.

Defendant recalled an incident while in prison for aggravated robbery where a Bloods' member told him to stab a "Crips" member. He stated that he stabbed the Bloods' member instead because he did not want to assault the Crips member. The Bloods' member then issued a "kill on sight" order for Defendant.

Defendant recalled another incident in prison when he was in a cell with another Bloods' member and the Bloods' member "stuck something in the door." Defendant explained that both he and the Bloods' member were "written up" for "tampering with security devices" due to this incident. Three different times, Defendant refused to live with a member of the Bloods due to threats he received, so he was written up for "refusing cell assignments."

Defendant testified that he was released from custody in November 2017 and that he moved to Knoxville. He said that he worked for a "temp service" for five or six months and then obtained permanent employment with a construction crew. Defendant recalled that his employment abruptly ended because he was hospitalized with leukemia and that he was on disability after his discharge from the hospital.

Defendant recalled a confrontation at a gas station where an acquaintance called him a "Blood." Defendant responded that he was no longer in the gang, and he and the acquaintance "had words" over it. Defendant said that, two weeks later while he was walking on Magnolia Avenue, someone "shot at" him. Defendant stated that he did not call the police because he did not want to "aggravate the situation." He explained, "[A] bullet don't have no name on it. So they shooting at me, they could hit my girl, hit her son, hit my niece, my nephew, anybody else. So I chose not to irritate the situation. Just let it die down." Defendant said that, after he was "shot at," he bought a gun the following day for protection, even though he knew he was not allowed to possess one as a convicted felon. He stated that he never shot the gun and never pointed it at anyone. He said he felt his life was threatened and that the threat "was more imminent than anything[.]"

On cross-examination, Defendant recalled that he stabbed his cell mate, who was a Bloods' member, three times in his back and chest. He recalled that he was questioned regarding the stabbing and that he told investigators in prison that the stabbing was not gang-related but said that he was a gang member. Defendant stated that, when he was released from prison, he did not return to Memphis because he could not stay with his family due to his "gang lifestyle."

- 8 -

Defendant agreed that Clinton Ector was a "prince" in the Bloods who told him to commit the aggravated robbery in 2008. He said that Mr. Ector renounced the gang lifestyle as well and that they remained in touch. Defendant explained his tattoos to the jury, that one stated "Young Banger," another read "ESB," and another read "Big Nine." Defendant agreed that those were all gang tattoos.

Defendant stated that he knew one of the people who shot at him while he was walking on Magnolia Avenue and that he recognized the vehicle as belonging to a Bloods' member. He agreed that innocent people lived near the shooting but that he chose not to report it to police.

Defendant testified that he was walking home from Kentucky Fried Chicken ("KFC") when he was arrested for unlawful possession of a firearm on January 6, 2019. He said that he knew the officers who arrested him on January 6 because they were the same officers who arrested him in the same location in October 2018, also for unlawful possession of a firearm. Defendant agreed that he could have explained to the officers in October 2018 that the reason he purchased a firearm was for protection but that he did not. He said, "That would have been me snitching. That would have [gotten] my girl [] shot at." He said that, after he was released on pretrial supervision for the first unlawful possession offense in October 2018, he went back to the same neighborhood and purchased another gun. He restated that he purchased a gun because he felt like his life was in danger. Then the following exchange occurred:

> Q. It didn't stop you from going to KFC?
>
> A. It didn't stop me from going to KFC.
>
> Q. So when you're at KFC, you're worried about the gang members shooting at you, right?
>
> A. I'm worried about those gang members shooting me every time I walk out of my house.
>
> Q. And all of the other people who are in KFC who are not a part of the gang, their lives [are] also in danger because you're there, right?
>
> A. They life -- you're right.
>
> . . . .

Q. You thought somebody was going to shoot at you. That's why you're carrying a gun, right?

A. That was protection.

. . . .

Q. And so if somebody is shooting -- if you're at the KFC and somebody shoots at you at the KFC, what are you going to do?

A. I will return fire.

. . . .

Q. And my only point is that the folks at the KFC, they didn't -- they didn't sign on for this. They're just there trying to get a dinner. And so while you are walking up and down Magnolia with your gun, ready to return fire, you're endangering all the folks in the neighborhood. That's my point. It's not their fault.

A. If somebody pulled up to you and you have your gun on your waist --

Q. See, that's the thing about it. I don't [] carry my gun. I keep my guns at my home.

A. If somebody pulled up on you and they start shooting and you have a gun on you, would you not return fire?

Q. I don't have a gun on me. If I did, I would have [gone] and got[ten] a [h]andgun [c]arry [p]ermit. If I was a convicted felon, I wouldn't have a gun on me. That's the point. It's the violence that you and your buddies are creating in the neighborhood. . . . That's what's so frustrating.

Defendant agreed that, when he was arrested for unlawful possession of a firearm in October 2018, no one was shooting at him. He agreed that, when he was arrested for unlawful possession of a firearm in January 2019, no one was shooting at him. He explained that his life was in danger "at [any] given time one of those gang members decide they want to shoot" him. Defendant stated, "From KFC to where I was arrested, my life was always in immediate danger." Defendant agreed that he was wearing red the day he was arrested and that red was "a Blood[s'] color."

- 10 -

During a jury-out hearing, defense counsel requested a jury instruction on the necessity defense. He argued that Defendant's life was in danger because he left the Bloods gang and that Defendant was "approached, threatened" and "shot at by some members of this gang." Defense counsel asserted that unlawful possession of a firearm was "a lesser offense than being murdered," so the harm Defendant was trying to avoid was greater than the harm caused by the offending act. The prosecutor responded that the necessity defense was not fairly raised by the proof, stating that Defendant was "carrying a gun around so he can shoot back." The prosecutor argued that Defendant's unlawful possession of a firearm would not have "prevent[ed] somebody from shooting at him" and that he carried the weapon for retaliation. The trial court concluded:

> It is very dangerous for a [c]ourt to prevent a defendant from presenting a theory of defense. . . . I think the evidence is simply that he -- whenever he goes out, he just -- he packs a gun now, just in case something goes wrong. So that's not imminent. It's potential, but not imminent. . . . I think where this [c]ourt's going to come down, knowing full well that this -- this could be reversible error, I just think it would be irresponsible to give this instruction based on these facts.

During the State's rebuttal closing argument, the prosecutor said:

> If you really are worried about fellow gang members shooting at you and you don't want to tell the police, stay at home. Don't go to KFC -- why [are] you going to KFC? Is it just that important, you going to put the entire community's life at risk because you want a two-piece chicken meal? Because you're a gang member? You're a[] convicted felon. You're not supposed to have a gun. . . . . We can't rebut that somebody shot at [Defendant]. You know why? Because it was never reported to the police. We found out about it when you did today. But if you really do want to change your conduct, if you really do want to be a productive citizen, a productive member of the community, report this criminal activity to the police. That's going to demonstrate to the police, that's going to demonstrate to your fellow citizens that you are truly out of the gang; that you want to live a fair and right-up just life; that you don't want to live a criminal lifestyle. No. But instead, you want to play these gang games. That's crazy. Walking up and down the street, going here -- to and from Walmart, KFC, wherever, in possession of a gun. What is so important that you got to go to these different places? Either your life is more important or entertainment's more important to you. And if entertainment's more important to you, then you are endangering everybody else that's around you when you do that, when

you leave the safety of your home, to be entertained. And you choose, Mr. Gang Member, to carry a gun.

The jury convicted Defendant of one count of unlawful possession of a firearm. Following testimony on count two for the criminal gang offense enhancement, the jury found that Defendant was a gang member based on two criteria but determined that the offense of unlawful possession of a firearm was not committed for the benefit of his gang. Thus, Defendant was acquitted of the criminal gang offense enhancement in count two.

### 3. October 17, 2019 Bench Trial Testimony in Case No. 115023

Prior to trial, the State moved to dismiss the criminal gang offense enhancement and elected to proceed only on the charge of unlawful possession of a firearm. Lieutenant Bush identified photographs of the property on Magnolia Avenue where the offense took place and stated that signs were posted on the property which read, "No Trespassing" and "Tenants Only." He said that the property was open to the public but that it was private property. Lieutenant Bush stated that he worked as private security for the property owners due to drug sales and "loitering" on the property. He said that, on October 24, 2018, there were only a few tenants who lived in the building and that he was familiar with all of them.

Lieutenant Bush recalled that, on October 24, 2018, he was on patrol with the KPD and that he saw Defendant "loitering" in the rear parking lot and that he knew Defendant was not a resident of the building. He said that other officers were on foot patrolling the building and making their way from the front to Lieutenant Bush. Lieutenant Bush explained that, when he pulled in to the parking lot, Defendant began walking away from him and towards the apartment building and up a handicap access ramp. Lieutenant Bush approached Defendant from the rear, and the other officers approached Defendant from the front and asked for his identification. One officer asked if he had any weapons, and Defendant raised his shirt to reveal a firearm in his waistband. Lieutenant Bush said that the officers ran a background check and discovered that Defendant had a felony criminal history.

On cross-examination, Lieutenant Bush agreed that the property residents were permitted to have guests. He explained that Defendant "was just standing there" in the parking lot for "[m]aybe a few seconds" and that, because he was not moving towards the building, he "drew [the officers'] suspicion." Lieutenant Bush did not see Defendant vandalize anything or otherwise engage in criminal activity other than trespassing. He said that usually when they encounter someone loitering in the parking lot, they question the person to see if they "have any legitimate business there" and, if not, that they put the loitering person on a "trespass list." He said that Defendant was not on that "trespass list." Lieutenant Bush did not recall if Defendant told the officers that he was there to visit a

friend. Lieutenant Bush agreed that, when the officers approached Defendant, Defendant was unable to walk forward past them. He agreed that Defendant gave his ID to the officers and was cooperative.

Defendant testified that he grew up in Memphis and joined the Bloods gang at the age of twelve. He said that he was convicted of theft and aggravated robbery as an adult. Defendant explained that, when he was in prison for aggravated robbery, he left the Bloods gang in 2012 and "got beat up twice" for trying to leave. Once he was released from prison in 2017, he was confronted and threatened by some gang members. A few weeks later, someone "shot at" him while he was walking on MLK Avenue. Defendant said that, after someone shot at him, he illegally purchased a gun for protection. He stated that he never used the gun or pointed it at anyone.

Defendant said that, on October 24, 2018, he was walking to the apartments on Magnolia Avenue to visit his friend "Rick" and play chess. He denied that he ever stood still in the parking lot. He said that officers approached him from the building while he was on the access ramp and asked for his identification. Defendant testified that he gave the officers his identification and told them whom he was there to visit.

On cross-examination, Defendant said that, when someone shot at him, he did not report it to police, nor did he tell the officers who confiscated the gun on October 24, 2018. Defendant agreed that, when he was stopped by police on October 24, no one was threatening him at that moment.

Defense counsel argued that Defendant was carrying the firearm on October 24 out of necessity because he needed to protect his life from threats from gang members. Following argument, the trial court rejected the necessity defense and found Defendant guilty of unlawful possession of a firearm. It explained:

> The [c]ourt understands what's going on here and has a certain amount of sympathy for [Defendant]. He had no drugs on him; he had no large amount of money to indicate drug dealing. So I'm inclined to believe him when he says he was going away from a life of crime. He was not going to commit further crimes, he didn't want anything to do with that life any more, he didn't want anything to do with gangs anymore.
>
> But unfortunately the gangs weren't through with him, apparently. And the [c]ourt has no reason to doubt that he was -- somebody did shoot at him or near him. And he had a legitimate concern that -- that he might be attacked again. So he knowingly and deliberately purchased a firearm, carried it with him loaded.

- 13 -

The [c]ourt would have to find that the justification defense is designed for a situation of instant, immediate emergency. . . . [I]f he had a handgun and he was under immediate attack by other people trying to shoot him, this [c]ourt would have to seriously consider applying the justification defense, if he just used the weapon on his own space to protect himself and defend himself. But that's not what was going on on this occasion. He was simply arming himself and traveling about with the armament just in case something went wrong.

### 4. Sentencing Hearing and Motion for New Trial

The trial court found that, due to Defendant's criminal history, he was a Range II multiple offender and that the statutory range for a Class B felony was twelve to twenty years. It stated that, because Defendant was out on pretrial supervision when the second offense occurred, it was statutorily required to sentence the Defendant to consecutive sentences. The trial court found that Defendant was trying to "get out of the gang" and that Defendant was in danger, so it determined that "minimal enhancement" for Defendant's criminal history was appropriate. The trial court sentenced Defendant to two consecutive thirteen-year sentences with a release eligibility of thirty-five percent.

Defendant filed a timely Motion for New Trial, arguing that the trial court erred in denying his pretrial Motion to Suppress and Amended Motion to Suppress in Case No. 115023 because the officers violated Defendant's Fourth and Sixth Amendment rights on October 24, 2018. He also argued that the trial court erred in denying Defendant's requested necessity instruction in his jury trial and denying the necessity defense in the bench trial because whether the danger to Defendant was "imminent" was a question for the jury. Following a hearing, the trial court denied Defendant's Motion for New Trial.

Defendant now timely appeals.

## II. Analysis

Defendant argues that the trial court erred in denying his Motion to Suppress and in rejecting the necessity defense. He contends that he is entitled to relief based on plain error because the prosecutor improperly questioned Defendant and made improper closing arguments. Finally, Defendant contends that the trial court erred by imposing consecutive sentences.

*A. Motion to Suppress*

Defendant argues that the trial court improperly denied his Motion to Suppress evidence of his firearm in Case No. 115023 because officers improperly seized him in violation of the Fourth Amendment. He asserts that the mere presence of a non-tenant in a parking lot adjacent to an apartment building is not enough to establish reasonable suspicion. He argues that "there is an implied license for someone to approach a residence in order to knock on the door" and that this implied license is not revoked by a "No Trespassing" sign. Defendant contends that the Class C misdemeanor of criminal trespass was not sufficient to warrant an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968). Defendant asserts that the trial court erred at the suppression hearing by refusing to allow Officer Brooks to testify (1) as to what Defendant told Officer Brooks regarding the reason for his presence at the apartment building and (2) whether Defendant was "standing still" or "walking through" the parking lot.

The State responds that the officers had reasonable suspicion that Defendant was involved in criminal activity when they stopped him in the parking lot. The State agrees that a "No Trespassing" sign does not revoke a license to approach a residence and knock on a door; however, it argues that Defendant was not approaching the residence but was simply loitering in the parking lot. The State contends that the officers appropriately questioned Defendant as to whether he was carrying a weapon to protect their own safety. It argues that Defendant waived the issue of the trial court's refusal to allow Officer Brooks to testify and contends that Defendant has not established plain error because Defendant made no offer of proof as to what Officer Brooks's testimony would be.

1. Standard of Review

The applicable standard of review for suppression issues is well-established. A trial court's findings of fact are binding on this court unless the evidence in the record preponderates against them. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing and all reasonable and legitimate inferences that may be drawn therefrom. *Id.* The trial court's application of law to the facts is reviewed under a de novo standard with no presumption of correctness. *Id.* (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). When reviewing a trial court's ruling on a motion to suppress, this court may consider the entire record, including the proof presented at the suppression hearing as well as at trial. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005); *Walton*, 41 S.W.3d at 81; *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998).

## 2. Testimony of Officer Brooks

Initially we note that the trial court did not permit Defendant to call Officer Brooks to testify at the suppression hearing because Lieutenant Bush had already testified as to his observations on the night of the offense. It stated that "there's no right to be free of interference on private property[,]"[4] and it did not believe that Officer Brooks would contradict this fact. The trial court found that Lieutenant Bush "saw [D]efendant on the property doing nothing but just standing there, which he calls loitering. . . . So he had at least reasonable suspicion that [D]efendant was then and there committing the act of criminal trespass." Defendant did not raise this issue in his Motion for New Trial; thus, it is waived. Tenn. R. App. P. 3(e). However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Under "the standard contained in Tennessee Rule of Criminal Procedure 52, "'error that affects substantial rights' has been construed as 'error with a prejudicial effect on the outcome of a judicial proceeding.'" *State v. Carlos Radale Cornwell*, No. E2011-00248-CCA-R3-CD, 2012 WL 5304149, at *26 (Tenn. Crim. App. Oct. 25, 2012) (quoting *State v. Gann,* 251 S.W.3d 446, 462 (Tenn. Crim. App. 2007)), *perm. app. denied* (Tenn. Oct. 25, 2012). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010).

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Here, the trial court erred by not allowing Defendant to call Officer Brooks to testify. *State v. Philpott*, 882 S.W.2d 394, 401 (Tenn. Crim. App. 1994) ("Denying a motion to

---

[4] Defense counsel stated that Officer Brooks testified at the preliminary hearing and that he would testify at the suppression hearing that Defendant was not loitering but was walking through the parking lot. The preliminary hearing transcript does not appear in the record on appeal.

suppress where the defendant is not given full opportunity to present relevant evidence is error."), *superseded by statute on other grounds as stated in State v. Michael Stewart*, No. W2008-02680-CCA-R3-CD, 2010 WL 681370, at *4 (Tenn. Crim. App. Feb. 26, 2010). However, the record does not clearly establish that Officer Brooks's testimony would have conflicted with Lieutenant Bush's testimony at the suppression hearing. Because Defendant made no offer of proof, and because the preliminary hearing transcript including Officer Brooks's testimony is not included in the record on appeal, Defendant has not shown plain error. *Adkisson*, 899 S.W.2d at 640-41; *Smith*, 24 S.W.3d at 283.

### 3. Reasonable Suspicion

The United States and Tennessee constitutions protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. I, § 7; *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). It is well-settled that courts have divided police-citizen encounters into three different categories: "(1) a full scale arrest which must be supported by probable cause . . . ; (2) a brief investigatory detention which must be supported by reasonable suspicion . . . ; and (3) brief police-citizen encounters which require no objective justification . . . ." *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000) (citing *Brown v. Illinois,* 422 U.S. 590 (1975); *Terry,* 392 U.S. at 20-22; *Florida v. Bostick,* 501 U.S. 429, 434 (1991)). Full scale arrests and brief investigatory detentions or stops are seizures and therefore implicate an individual's rights under the Fourth Amendment of the U.S. Constitution and under Article I, Section 7 of the Tennessee Constitution, but a consensual police-citizen encounter does not. *See id.*

Generally, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 525, 629 (Tenn. 1997). A warrant is not required for an investigatory stop "when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *State v. Bridges*, 963 S.W.2d 487, 492 (Tenn. 1997); *see also Terry,* 392 U.S. at 21; *Binette*, 33 S.W.3d at 218; *Yeargan*, 958 S.W.2d at 630; *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992). Reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity . . . , and it is determined by considering the totality of the circumstances surrounding the stop[.]" *Binette*, 33 S.W.3d at 218 (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *Alabama v. White*, 496 U.S. 325, 330 (1990)).

The State conceded at trial that a Fourth Amendment seizure occurred in the present case. Thus, the question regarding suppression of the firearm is whether Lieutenant Bush had reasonable suspicion to detain Defendant. While patrolling, Lieutenant Bush observed

Defendant standing still for "[m]aybe a few seconds" in the parking lot of an apartment building containing six rental units. The portion of the parking lot fronting Magnolia Avenue was fenced. Attached to the fence was a sign that stated: "Cameras in Use[,] Video Recordings Will Be Used To Prosecute Criminal Activity." The entire width of one side of the parking lot was not fenced making the parking lot accessible to the tenants, their guests, and individuals having a legitimate reason to be on the premises. Two signs were affixed to the side of the building adjacent to the parking lot. One sign was identical to the sign on the fence. The second sign stated: "No Trespassing, Tenants Only, Enforced by Knoxville Police."

Lieutenant Bush said that "when we observe somebody just standing around, appearing not to have a reason to be there, that's what draws our attention to the area that, you know, he clearly was not supposed to be there." Other than stating that he knew Defendant was a not a resident of the apartment building, Lieutenant Bush did not elaborate on why Defendant appeared not to have a reason to be there. Defendant held an implied license to approach a front door of a residence and knock, and his standing still for "[m]aybe a few seconds" did not convert that implied license into criminal trespass. *See State v. Christensen*, 517 S.W.3d 69-70, (Tenn. 2017) (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013)) (An "implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."); *see id*. at 60 (quoting *State v. Rigoulot*, 846 P.2d 918, 923 (Id. Ct. App. 1992)) ("[P]osting "No Trespassing" signs may indicate a desire to restrict unwanted visitors and announce one's expectations of privacy[, but] such signs cannot reasonably be interpreted to exclude normal, legitimate inquiries or visits by mail carriers, newspaper deliverers, census takers, neighbors, friends, utility workers and others who restrict their movements to the areas of one's property normally used to approach the home."). Such a conclusion would render illegal any person's approach of a residence displaying a "No Trespassing" sign, including a law enforcement officer's approach for a "knock and talk," if that person stands still on the sidewalk for "a few seconds" before reaching the front door. *See id*; *United States v. Carloss*, 818 F.3d 988, 995 (10th Cir. 2016). Taken in the light most favorable to the prevailing party, we conclude that, under the totality of the circumstances, Lieutenant Bush did not have reasonable suspicion to conduct an investigatory stop of Defendant simply because he was standing in a private parking lot for "[m]aybe a few seconds" before approaching the apartment complex. *See State v. Moats*, 403 S.W.3d 170, 180 (Tenn. 2013) (citing *United States v. See*, 574 F.3d 309, 315 (6th Cir. 2009)) (stating "that the early hour of the morning, the high crime area, and the request that the officer be on the lookout for loiterers, among the other factors present, did not qualify as reasonable suspicion," and "explaining that the officer was not responding to a complaint, did not suspect the men of a specific crime, did not observe the men acting suspiciously, and did not cause them to flee upon seeing his police car"), *overruled on other grounds by State v. McCormick*, 494 S.W.3d 673 (Tenn. 2016); *State v.*

*Herbert Lee Massey*, No. 01C01-9406-CR-00218, 1995 WL 518872, at \*4 (Tenn. Crim. App. Sept. 5, 1995) ("That the defendant might be guilty of criminal trespass for standing on a public street corner does not qualify as an articulable, reasonable suspicion."). Because the officers did not have reasonable suspicion to conduct the investigatory stop, we conclude that the trial court erred in denying Defendant's Motion to Suppress the firearm Defendant was carrying.

When evidence is obtained in violation of Fourth Amendment search and seizure protections, such evidence must be excluded at trial. *Herring v. U.S.*, 555 U.S. 135, 139 (2009); *U.S. v. Leon*, 468 U.S. 897, 906 (1984); Tenn. R. Crim. P. 41(g); *see also State v. Reynolds*, 504 S.W.3d 283, 309-10 (Tenn. 2016). Because we conclude that the officers did not have reasonable suspicion to conduct an investigatory stop, the firearm obtained during that stop should have been excluded at trial. Without the firearm, there is no evidence that Defendant committed unlawful possession of a firearm on October 28, 2018. Thus, we reverse the judgment of the trial court in Case No. 115023, vacate Defendant's conviction, and dismiss the charge of unlawful possession of a firearm.

### B. Necessity Instruction

Defendant argues that, because he received threats after trying to leave the Bloods gang, he purchased a gun out of necessity. Defendant believed that "this threat was continuing and imminent." He contends that, taken in the light most favorable to him, the evidence supported the conclusion that necessity was fairly raised by the proof, and he argues that the issue of imminence was a jury question.

The State responds that Defendant experienced no imminent threat of harm; thus, the evidence did not fairly raise the necessity defense.

"It is well-established in Tennessee that the trial court has the duty of giving a correct and complete charge of the law applicable to the facts of the case and that the defendant has the right to have every issue of fact raised by the evidence and material to the defense submitted to the jury upon proper instructions by the trial court." *State v. Green*, 995 S.W.2d 591, 604-05 (Tenn. Crim. App. 1998) (citations omitted). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001). "Once a general defense is fairly raised, it is incumbent upon the State to negate, beyond a reasonable doubt, the application of a general defense." *State v. Cole-Pugh*, 588 S.W.3d 254, 264 (Tenn. 2019). Whether jury instructions are sufficient is a question of law, which we review de novo with no presumption of correctness. *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014).

The common law defense of necessity, like self-defense, is grouped with the defenses that provide a justification excluding criminal responsibility and are codified in Part 6 of Chapter 11, Title 39 of our Code. Tennessee Code Annotated section 39-11-609 provides:

> Except as provided in §§ 39-11-611—39-11-616, 39-11-620 and 39-11-621, conduct is justified, if:
>
> (1) [t]he person reasonably believes the conduct is immediately necessary to *avoid imminent harm*; and
>
> (2) [t]he desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

Tenn. Code Ann. § 39-11-609 (2019) (emphasis added). The Comments of the Tennessee Sentencing Commission concerning section 39-11-609 state, in part:

> This section codifies the common law defense of necessity. It excuses criminal liability in those exceedingly rare situations where criminal activity is an objectively reasonable response to an extreme situation. For example, the necessity defense would bar a trespass conviction for a hiker, stranded in a snowstorm, who spends the night in a vacant cabin rather than risking death sleeping in the open.
>
> The defense is limited to situations: (1) where the defendant acts upon a reasonable belief that the action is necessary to avoid harm; and (2) where the harm sought to be avoided is clearly greater than the harm caused by the criminal act. The defense is further limited in application to those offenses where it is not expressly excluded by statute.

Tenn. Code Ann. § 39-11-609, Sent'g Comm'n Comments.

"The defense of necessity is predicated on the theory that it is better to allow a crime to go unpunished where the crime was committed to avoid a greater and more serious harm[.]" *Marquis D. Hendricks v. State*, No. E2016-02123-CCA-R3-PC, 2017 WL 3174074, at *7 (Tenn. Crim. App. July 26, 2017) (citing 11 David Louis Raybin, TENNESSEE PRACTICE, CRIMINAL PRACTICE & PROCEDURE § 28:59 (2016)), *perm. app. denied* (Tenn. Nov. 16, 2017). "Necessity has traditionally been used appropriately when the extreme situation is brought on by something other than a human act." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing Neil P. Cohen, et al.,

- 20 -

*Prevalence and Use of Criminal Defenses; A Preliminary Study*, 60 Tenn. L. Rev. 957, 966 (1993)). Necessity is not an affirmative defense that must be proven by a defendant. *State v. Culp*, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994). Necessity provides a general defense which must only be fairly raised by the proof before being considered by the trier of fact, and any reasonable doubt on the issue requires an acquittal. Tenn. Code Ann. § 39-11-203(c), (d) (2019).

Here, Defendant testified to prior threats from gang members and a prior instance where someone fired a gun in his direction. He stated that this caused him to fear for his life and the lives of his girlfriend and her child. Defendant then illegally purchased a gun "for protection," and the trial court accredited his testimony. However, when Defendant was arrested, no one was in the vicinity threatening Defendant or anyone else. Thus, Defendant "failed to demonstrate that the threat was imminent, requiring immediate action on his part." *Davenport*, 973 S.W.2d at 288; *see also United States v. Ridner*, 512 F.3d 846, 849 (6th Cir. 2008) (quoting *United States v. Perez,* 86 F.3d 735, 737 (7th Cir. 1996)) ("The defense of necessity will rarely lie in a felon-in-possession case unless the ex-felon, not being engaged in criminal activity, does nothing more than grab a gun with which he or another is being threatened[.]"). Because the necessity defense was not fairly raised by the proof, the trial court did not err in declining to instruct the jury on necessity.

## C. Improper Prosecutorial Argument

Defendant argues that he is entitled to relief based on plain error because the prosecutor improperly interjected issues unrelated to guilt or innocence into the jury trial in Case No. 114910. He contends that, during the State's cross-examination of Defendant, the prosecutor "began to lecture him on her views and opinions" rather than ask questions. He asserts that this "cross-examination was not even questioning, but rather a speech on behalf of the prosecutor."

Likewise, Defendant argues that the prosecutor improperly argued during her closing argument that Defendant should have reported the alleged shooting to the police to "demonstrate[] to the police [and] to [his] fellow citizens that [he was] truly out of the gang." He contends that she improperly argued that Defendant "endangered the community for his own entertainment." Finally, he asserts that the prosecutor's claim that Defendant and his "'buddies' were creating violence in the neighborhood" was irrelevant and unsupported by the evidence.

The State responds that the prosecutor's closing argument was in response to Defendant's theory of defense, that any improper argument did not affect the jury's verdict, and that Defendant has failed to show plain error. We agree with the State.

Defendant did not object to the comments of which he now complains; thus the issue is waived. *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). Therefore, we are limited to plain error review of this issue. Tenn. R. App. P. 36(b); *Hatcher*, 310 S.W.3d at 808.

"Trial courts have significant discretion to control closing arguments." *State v. Banks*, 271 S.W.3d 90, 132 (Tenn. 2008). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). It is improper for a prosecutor to engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. *Banks*, 271 S.W.3d at 131. Moreover, "[s]ome arguments may be so exceptionally flagrant that they constitute plain error and provide grounds for reversal even if they were not objected to." *Id.* at 132. "Defendant would have to show that the prosecutor's allegedly improper argument was 'especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error.'" *State v. Richard Gleason*, No. W2018-01389-CCA-R3-CD, 2020 WL 633111, at *8 (Tenn. Crim. App. Feb. 10, 2020) (quoting *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006)).

We conclude that the prosecutor's remarks during cross-examination and closing argument were not so egregious as to "strik[e] at the very heart of the fairness of the judicial proceeding[.]" *Id.* Because Defendant admitted to the elements of the offense, namely, that he was a felon and that he possessed a firearm, even if the prosecutor's comments were improper, we conclude that they did not have a "prejudicial effect on the outcome of [the] judicial proceeding." *Carlos Radale Cornwell*, 2012 WL 5304149, at *26. Thus, no substantial right of Defendant was adversely affected. *Adkisson*, 899 S.W.2d at 640-41. Defendant has not established plain error and is not entitled to relief.

### D. Consecutive Sentencing

Defendant argues that the trial court improperly sentenced Defendant to consecutive sentences. He contends that the trial court misconstrued the facts because Defendant was not "released on bail" at the time of the second offense but was on "pretrial release," and thus, the trial court misapprehended that consecutive sentences were statutorily required.

The State contends that this issue is waived because Defendant raises it for the first time on appeal. It argues that Defendant has not established plain error because no unequivocal rule of law has been breached.

Tennessee Code Annotated section 40-20-111(b) (2019) states:

In any case in which a defendant commits a felony while the defendant was released on bail in accordance with chapter 11, part 1 of this title, and the defendant is convicted of both offenses, the trial judge shall not have discretion as to whether the sentences shall run concurrently or cumulatively, but shall order that the sentences be served cumulatively.

Tenn. Code Ann. § 40-20-111(b) (2019). Tennessee Rule of Criminal Procedure 32(c) is a restatement of Tennessee Code Annotated section 40-20-111, *State v. Beau C. Vaughan*, No. M2014-02530-CCA-R3-CD, 2015 WL 8974913, at *3 (Tenn. Crim. App. Dec. 15, 2015), and states, in pertinent part:

When a defendant is convicted of multiple offenses from one trial or when the defendant has additional sentences not yet fully served as the result of convictions in the same or other courts and the law requires consecutive sentences, the sentence shall be consecutive whether the judgment explicitly so orders or not. This rule shall apply . . . to a sentence for a felony committed while the defendant was released on bail and the defendant is convicted of both offenses[.]

Tenn. R. Crim. P. 32(c)(3)(C).

"Bail" is defined in the Black's Law Dictionary, in part, as follows:

1. A security such as cash, a bond, or property; esp., security required by a court for the release of a criminal defendant who must appear in court at a future time[;]

2. The process by which a person is released from custody either on the undertaking of a surety or on his or her own recognizance[;]

3. Release of a criminal defendant on security for a future court appearance; esp., the delivery of a person in custody to a surety[;]

4. One or more sureties for a criminal defendant[.]

"As a noun, and in its strict sense, bail is the person in whose custody the defendant is placed when released from jail, and who acts as surety for defendant's later appearance in court . . . . The term is also used to refer to the undertaking by the surety, into whose custody defendant is placed, that he will

- 23 -

produce defendant in court at a stated time and place." 8 C.J.S. *Bail* § 2 (1988).

BAIL, Black's Law Dictionary (11th ed. 2019).

This court has previously held that a pretrial release of a juvenile into his mother's custody had the same effect for mandatory consecutive sentencing as a release on bail. *Anthony Keshun Goods v. Tony Parker, Warden*, No. W2006-00849-CCA-R3-CO, 2007 WL 2120178, at *6 (Tenn. Crim. App. July 24, 2007). This court reasoned that, "when the Legislature passed [Tennessee Code Annotated section 40-20-111], it intended that individuals who were out on their own recognizance, in addition to those who had to present a cash surety, would be required to serve consecutive sentences should they commit another crime while out of jail awaiting a disposition of their prior charge(s)." *Id*. "Whether one will be required to serve concurrent or consecutive sentences should not hinge on a trial court's initial impression of whether a defendant will likely return to court to face charges." *Id*. We agree. For purposes of Tennessee Code Annotated section 40-20-111(b), a defendant who commits a felony while on pretrial supervision for another crime, and is convicted of both crimes, is required to be sentenced to consecutive sentences. Therefore, the trial court did not err in sentencing Defendant to consecutive sentences.

### III. Conclusion

We affirm the judgment of the trial court in Case No. 114910. We conclude that the trial court erred in denying Defendant's Motion to Suppress in Case No. 115023. Accordingly, in Case No. 115023, the judgment of the trial court is reversed, Defendant's conviction is vacated, and the charge of unlawful possession of a firearm is dismissed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 24 -